THE WESTERN RAILROAD COMPANY, RESPONDENT,
*v.* LAWRENCE P. BAYNE AND HENRY J. ROGERS,
APPELLANTS.

*Contract made by corporation — how it may be modified — deposit of bonds to meet
payments under — assignment of, to director of company.*

The plaintiff, by resolution, authorized its president and three directors to contract with Hunt & Co. to build their road. The contract provided that a part of the compensation for the work should be paid for in plaintiff's bonds according to monthly estimates, 885 bonds to be placed in the hands of an agent (the defendants), to be held subject to the joint order of the plaintiff's president and the contractors; that the contract should not be transferred without the assent of plaintiff's engineer. Payments on the contract were to be made according to monthly estimates of the engineer.

December 5, 1870, the contract was assigned by Hunt & Co. to Lutterloh, one of the three directors who signed the contract. December tenth, a joint order of the president and Hunt & Co. was given defendants to hypothecate sufficient bonds to pay $20,000, the defendants having accepted a draft for that sum. On December twenty-one, by a joint order from the president and Hunt & Co., defendants were directed to turn over the bonds, subject to the payment of the draft, to said Lutterloh. January 5, 1871, a paper, ratifying the assignment to Lutterloh and modifying the original contract so as to place all the mortgage bonds in the hands of said Lutterloh, was signed by the president and the director of the road, and a director of the company. The defendants surrendered to Lutterloh 460 of the bonds and gave him a receipt, stating that they held the remaining 425 bonds to secure their acceptance of the draft, and such other advances as they might make. The funds obtained upon the draft accepted by defendant, were not employed for the benefit of the road. The work of Hunt & Co., under the contract, did not exceed in value $3,500, and that of Lutterloh $900. In an action by the plaintiff to recover the 425 bonds, *held*,

That the agreement of January 5, 1871, modifying the contract, was void, as it could only be modified by action of the directors, the power of the president and committee being exhausted when the first contract was executed.

That the president had no authority to act for the corporation, no acquiescence by it in such acts on his part being shown.

That Lutterloh could not act as committeeman and assignee of the contract at the same time.

That defendants knowing the terms of the contract, occupied the position of trustees for the plaintiff, and were bound to investigate the power arrogated, to modify the original contract, and before accepting the draft to determine if work to its amount had been done.

That the defendants had no lien, as against the plaintiff, upon the bonds held by them for the acceptance of the draft or for any advances made to Lutterloh.

That although under a contract with Hunt & Co., defendants were entitled to a commission of five per cent to be paid them, and to which they were entitled as soon as the bonds came into their custody, yet the discharge of their duty was a prerequisite to their earning it, and as they were derelict in their duty towards plaintiff, whatever their claim might be against Hunt & Co., they had no claim for commissions against the plaintiff.

APPEAL from a judgment in favor of the plaintiff, entered on the report of a referee. The action was brought to recover 425 one thousand dollar bonds of the plaintiff. The answer alleges that the defendants have a lien on the bonds for money advanced.

*Algernon S. Sullivan*, for the appellants.

*Moody B. Smith*, for the respondent.

BRADY, J.:

The plaintiffs, by resolution, authorized the president of their road and a committee of three directors, with the assistance of the chief engineers of the road, to contract with Hunt & Scales, or other parties, to build their road from Egypt to Greensboro. D. J. Underwood, W. B. Richardson and T. S. Lutterloh, were appointed such committee. On the 11th of October, 1870, a contract was accordingly made with Hunt & Scales. It contained, among other provisions, the following articles:

"Article 10. On condition of the fulfillment, by said contractors, of the foregoing provisions of the contract, the said Western Railroad Company doth hereby promise and agree, that the said corporation shall and will, for doing and performing the work as aforesaid, pay or cause to be paid to J. Hunt & Co., the said contractors, or their heirs, executors or administrators, for so much of said work as is paid for in cash, according to the rates specified in the bids of said contractors, made on the 10th day of July, 1870, filed in the office of the said railroad company, and accepted by the committee of the board of directors, a copy of which bid is hereby appended, marked A, and made part of this contract, the remaining portion of said work to be paid for in the first mortgage bonds of the said railroad company, at their par value, according to the rates specified in the bid of the said contractors filed in the office of the said railroad company, and dated July 10, 1870, a copy of which bid is hereto appended, marked B, and made a part of the contract.

" Article 11. Monthly estimates, during the progress of the work, will be made of work done to the acceptance of the engineer, to an amount equal to a fair average value of the same, agreeably to this contract, and of the amount so estimated, the contractor will be paid ninety per cent, and when the whole work hereby contracted for shall have been accepted by the engineer, or completed agreeably to this contract, the balance due shall forthwith be paid to the said J Hunt & Co., their heirs, executors or administrators.

" Article 12. The said railroad company agree to place the said mortgage bonds in the hands of an agent to be held subject to the joint order of the president of the said railroad company and the said contractors."

On the 9th of December, 1870, the defendants, who constituted the firm of L. P. Bayne & Co., received the bonds under article 12, and on the terms expressed as follows: " Received of A. J. Jones, president of the Western Railroad Company, 885,000 first mortgage bonds of the sum of $1,000 each, deposited with us as agents in accordance with the provisions of the contract made between Messrs. Hunt & Scales of the one part, and the Western Railroad Company on the other part, which contract is on file in the office of said company, at Fayetteville, North Carolina, and said bonds subject to the joint order of the president and contractor, to be drawn and used at their discretion, and for no other purpose.

" This *December* 9, 1870.

                                " (Signed)          L. P. BAYNE & Co.
" Witness, CHAS. HOUGH."


On the 10th of December, 1870, the president of the road and Hunt & Scales delivered to the defendants a joint order authorizing them, in accordance with the powers conferred upon the former by the contract, to hypothecate or sell a sufficient amount of the bonds to pay and meet a draft of $20,523.93. The draft was drawn by John A. Hunt & Co., in favor of R. Y. McAdam, and the amount of it appears to have been paid to the president of the road. On the 5th of December, 1870, the contract was assigned by Hunt & Scales to Thomas S. Lutterloh, and on the 5th of January, 1871, an agreement was executed relating to such assignment in favor of Lutterloh, which was signed by the president, W. B. Richardson,

the director of the road, and D. J. Underwood, a director of the company. By this instrument, the seventh article of the contract, which prohibited the contractors from letting or transferring it or any portion of it without the consent of the engineer, was rescinded and made void and of no effect, so far as Lutterloh was concerned It was also provided by that instrument as follows :

" And it is further covenanted and agreed that article 12 of the said agreement with J. Hunt & Co., shall be revoked, made void and of no effect, and the following article shall be substituted in lieu thereof, viz. :

"Article 12. The said mortgage bonds shall be placed in the hands of the said Thomas S. Lutterloh, contractor, to be held and used by him for the purpose of securing advances of money for the performance of work to be done under this contract; and the said contractor shall account with the said company, whenever thereto required, for all moneys paid to him heretofore, or which may be paid hereafter, and all bonds delivered to him heretofore, or which may be delivered to him hereafter, at the par value thereof."

Before this agreement was executed, and on the 21st of December, 1870, by a joint order from the president and the contractors, J. A. Hunt & Co., the defendants were directed to turn over to T. S. Lutterloh the bonds deposited with them subject to the draft in favor of McAdam, which was to be secured in that way. The defendants then surrendered 460 of the bonds for which the receipt of Lutterloh was given as contractor. On the 22d of December, 1870, Lutterloh gave the defendants an order which, referring to the 425 bonds held by them on his account subject to the lien of their acceptance for the McAdam draft, concluded as follows : " You will hold the same as collateral for any advances made me and for such purposes you are authorized to hypothecate the same."

The defendants, on the same day, accepting the new relations thus created, gave their receipt as follows :

"NEW YORK, *December* 22, 1870.

"Received of T. S. Lutterloh, Esq., contractor of Western Railroad Company, four hundred and twenty-five bonds, the same held by us for his account, subject, however, to our acceptance of a draft for twenty thousand five hundred and twenty-three dollars and ninety-three cents in favor of R. Y. McAdam, Esq., of N. C., and

subject also to such advances as we may make upon his order, we, for the above advance and acceptance, having power to hypothecate said bonds or any part of them.

" L. P. BAYNE & CO."

It seems to have been considered necessary, in order to make Lutterloh the custodian of the bonds, to rescind article 12 of the contract, which provided that they should be placed in the hands of an agent, subject to the joint order of the contractor and of the president, and to provide by further agreement that the bonds should be placed in his hands. This was accordingly done, as we have seen by the instrument of January 5, 1871. It appears also that the McAdam draft was a renewal draft. It does not appear that the funds received through its agency were employed for the benefit of the road. There is no pretense that it had any legitimate relation to the contract for which alone the bonds were deposited with the defendants, while it does appear that the joint order of Hunt & Co. and the president to hold the bonds for its payment was made after Hunt & Co. had assigned their contract. It is true that Lutterloh accepted the situation of affairs thus existing, and renewed the order for the security of the payment of the draft after he became the assignee and contractor. An important question here presents itself, seriously affecting the rights of the defendants, and that is whether the agreement of the 5th January, 1871, which is in effect a new contract, was authorized by the plaintiffs, because if it was, it is quite apparent that a part of the defendant's claim would be secured. It seems to be clear, however, that it was not authorized. The by-laws of the plaintiffs provide that contracts shall be made under such rules and regulations as the board of directors may prescribe, and again, that the president and directors shall have power to employ engineers and such other officers and agents as they may think proper. The power to make the original contract was granted by the directors and conferred, as stated, on the president and a committee of three directors, with the assistance of the chief engineer of the road. The contract was made. There was no authority given to change it, and if there had been, the change was not made through the instrumentality of the persons designated. The presumption of authority does not arise in this case from the

constant or general exercise of such a power with the knowledge of the board of directors, because there is no proof of such exercise of power. The contract expressed the source of authority for making it, namely, the resolutions stated. The power conferred must be exercised as granted, and the officers of a corporation can exercise only the powers expressly conferred, or such as they are permitted to perform sufficiently long to justify the conclusion of acquiescence by the board of directors. (*Beatty* v. *Marine Ins. Co.*, 2 Johns., 109; *Fulton Bank* v. *The N. Y. and Sharon Canal Co.*, 4 Paige, 127; *Elwell* v. *Dodge*, 33 Barb., 336; *Jackson* v. *Campbell*, 5 Wend., 572; *Life and Fire Ins. Co.* v. *Mechanics' Ins. Co.*, 7 id., 31.) The power of the committee and the president was expended, therefore, when the contract was executed. Lutterloh could not be committeeman and assignee of the contract at the same moment, and hence the necessity of further action by the board of directors. The joint services of the persons named were desired by the plaintiff, and the duties assumed could not be delegated. When Lutterloh determined to purchase the contract, if with an honest design and new conditions, he should have communicated the fact to the board and they could have selected another in his place. He did not do so nor did any of the others chosen, so far as disclosed by the evidence. Lutterloh could not complain of such a rule. He was a director of the company, and knew that by the charter and by-laws of the corporation which were proved herein, the persons who signed the agreement could exercise no such power, unless it was conferred in the manner provided. He also knew what the original contract was; that it had been made by the committee selected for the purpose; that they had discharged that duty, and that the contract was complete. He also knew that the modification of the contract was not executed by the committee selected to make it. He was not only a director of the company, but dealing with the corporation, and must be presumed to know exactly what authority the president possessed and the object and design of the deposit of the bonds with the defendants. So far as he was concerned the agreement was void, absolutely so. The case shows no ratification of the contract altered as suggested by the corporation. It seems to have been a part of a scheme for some purpose other than the building of the road in which the president, Hunt & Co. and Lutterloh

were concerned. This is the more apparent from the fact that the work done under the contract by Hunt & Co. did not exceed $3,500, and that under Lutterloh, if any thing was done, did not amount to more than $900. The defendants knew that the original deposit of the bonds with them was under the contract between the plaintiffs and Hunt & Co., and that they were for no other purpose. They knew also that Lutterloh was a director. They were fully advised, therefore. The receipt which they signed contained a statement of the place where the contract was filed and its relation to the deposit was clearly defined. They thus assumed and occupied the position of trustees for the plaintiffs and the contractors, and not mere holders or depositaries, and were bound to discharge the joint obligation thus assumed, faithfully. When, therefore, the modifications of the contract was made, it became their duty to investigate the power arrogated to make it and to determine thereupon whether the bonds of the plaintiffs could be placed under the control of the contractor alone, with the right to employ them at his pleasure, regardless of the question whether he did any thing under the contract or not, and thus to divert them from the purpose for which they were expressly appropriated. They are chargeable with actual notice of the provisions of the contract, its object and design. With such knowledge they accepted at once the draft of McAdam, and at a time when the whole amount of work done did not exceed $3,500, if any had been done, and when, by reference to the contract, it would have appeared that the work was to be paid for on monthly estimates. They not only did this but surrendered 460 of the bonds, although it is apparent, from the manner in which it was done, that they doubted the legality of the proceeding and changed their relations to the plaintiffs by receiving the balance of the bonds, namely, 425, subject to the payment of that draft, and also to such advances as they might make upon the order of Lutterloh, thus agreeing absolutely to make advances upon his order, without reference to the provisions of the contract, which, as the plaintiff's agents, they were bound to regard and observe. The effect of the modification and the understanding, as suggested, was to place these bonds entirely in the possession of the contractor, and in advance of and without regard to any work under the contract to be done by him in accordance with its terms. He acquired no right, however, to the bonds or any of

them, except as assignee of the contract, and subject, of course, to its provisions. He was a director of the company, and chargeable with knowledge that the plaintiff's then president had no authority, under its charter and by-laws, to make the modification which gave him the control of the bonds, and that he and the defendants all became wrong-doers in regard to them when they attempted to deal with them other than as the property of the plaintiffs, to be disposed of only when the terms of the contract and deposit were complied with. There is no pretense that there was any power given to any person to make the modification. The contract was complete when signed. The defendants were dealing with a corporation which was represented by its directors and officers, the latter limited in their authority to contract obligations which the corporation was bound to fulfill. This sale applied as well to the draft of $20,523.93, unless it was made good by the earnings of Hunt & Scales, under the contract of which the defendants took the risk. Hunt & Scales did not earn it, and it became a debt of Hunt and not that of the plaintiffs. We are not advised by the case what the opinion of the referee was upon this subject, and left to conjecture if we seek to learn it. The case is one in which an opinion would have been of service upon the facts, because it rarely happens that an appellate tribunal, from a study of the printed evidence, can get the more impressive view which is made by hearing and noting the testimony as it is given. It is true that there is much testimony in reference to an attempted compromise between the plaintiffs and the defendants, after the succession of another president, but it was objected to by the plaintiffs on the ground that it related to a compromise by which the plaintiffs hoped to get their bonds, and was inadmissible. The objection was well taken, and the testimony received, in considering the whole case, ought not to weigh against the plaintiffs. The parties did not settle, and the defendants, for advances and commissions, claimed a much larger sum than that which the plaintiffs were willing to pay, although the defendants were willing to take less. The payments under the contract were not to be made until the engineer approved of the work done, and the validity of the advances under the contract affecting the plaintiffs' property, necessarily depended, therefore, upon that incident which did not occur. This observation is made to meet the claim for alleged advances by the defendants over the draft of

Hunt & Scales, to which reference has been made. These views dispose of the lien of the draft and the advances in addition thereto, which are not sustained, being subject to the same reasoning and result. The defendants claim, in addition to the advances, a commission of five per cent, which they say was to be paid them, and to which they became entitled as soon as the bonds were placed in their custody. It was not necessary, they say, that they should be negotiated. It mattered not, under this alleged agreement, what disposition of the bonds was made, the commission was earned. The defendants admitted, however, that the discharge of their duty was a prerequisite to the earning of the commissions. The agreement was made with Hunt & Co. The defendants' right to commissions as a lien on the bonds, must be determined by the relations existing between them and the company. If the result stated herein be correct, namely, that they were derelict in duty, whatever claim they may have against Hunt & Co. or Lutterloh, they have none against the plaintiff. Nor have they any claim against Hunt & Co. or Lutterloh, which is a lien on the bonds of the plaintiffs, because the bonds could only be affected by a proper use of them, namely, an appropriation in accordance with the contract and the terms of the deposit, which was a trust. If the defendants, in other words, were innocent holders, the lien for commissions might be upheld. It is true that the agreement alleged to have been made was extraordinary, because, as we have seen, the commissions were due at once as soon as the bonds were deposited with the defendants. It was doubtless necessary to give it this sweeping character because 460 of the bonds were surrendered to Lutterloh and not negotiated or advanced upon. It is not necessary, however, to dwell upon that feature of this appeal. It is enough that the defendants omitted their duties, as trustees, to the prejudice of the plaintiffs. The plaintiffs have received nothing, comparatively, for the bonds which were appropriated to the completion of the road. They were hypothecated for other purposes both by the then existing president and by Hunt & Co. and Lutterloh, and were dealt with as if they could be bartered without any observance of the acts which alone could properly send them abroad, namely, the performance of the conditions of the contract. The failure of the defendants rests, therefore, on the broad proposition that in receiving the bonds as the agents of the plaintiffs,

although subject to the joint order of the president and the contractors, they had a duty to perform and could not part from them except in conformity to the original contract and for the purposes thereof. The case is not free from embarrassment, and perhaps not free from doubt, but the conclusions stated are in harmony with legal principles and with the equities growing out of the transactions. The defendants cannot be regarded as having acted in good faith and innocently. Their learned counsel urges that they not only were acting in good faith but with due regard to all their obligations. He thus presents a summary of this case, and which, he thinks, states it correctly both as to the facts, the justice and equity of it. "The case then sums up in a narrow issue. A railroad company made a contract for the completion of their railroad, the work and materials to be paid for either in their bonds or in the proceeds thereof, if sold. They place said bonds in the hands of their president and of their contractors, for purposes contemplating the raising of money thereon. The only notice given to the public was in a clause of said contract that said bonds should be deposited with an agent, subject to 'the joint order' of said president and said contractors. L. P. Bayne & Co., in good faith, made their agreements and made large advances, relying on the authority of said president and contractors, and having such 'joint-orders' duly in their possession. Even if the acts of said A. L. Jones, or of the contractors, were fraudulent (which is not proven), there is no ground for any charge that L. P. Bayne & Co. were cognizant of it. This railroad company assume that their officials and contractors defrauded them, and, taking their assumption for proof, that third parties who dealt with them in good faith, *when acting within the scope of their authority, must lose their advances.*" It will be perceived that this is more favorable than the facts warrant. The notice given was, that the bonds were deposited in accordance with the provisions of a contract, and were to be used for no other purpose than the contract. The report of the referee should, for these reasons, be confirmed, with costs, because it restores the bonds held by the defendants to the rightful owners of them.

DAVIS, P. J., and DANIELS, J., concurred.

Referee's report confirmed, with costs.